Samuel J. Grauman and Aurora G. Grauman v. Commissioner.
Grauman v. Commissioner
Docket No. 86984.
United States Tax Court
T.C. Memo 1964-226; 1964 Tax Ct. Memo LEXIS 111; 23 T.C.M. (CCH) 1368; T.C.M. (RIA) 64226; August 26, 1964
Scott P. Crampton, 815 Bowen Bldg., Washington, D.C., for the petitioners. Daniel Lee Stewart, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1950, 1951, 1952 and 1953 in the amounts of $619.86, $1,320.42, $951.80 and $765.90, respectively. Only a part of the proposed deficiencies remain in dispute. There are four issues to be decided. The first is the right of the petitioners to treat as ordinary losses certain sales of real estate which they made in 1953. The second is the right of the petitioners to treat as a business bad debt a loan in the amount of $4,328.75 which *112 became worthless upon the liquidation of the corporate debtor. The third issue involves the right of the petitioners to deduct as a business expense, or a business loss, the amount of $2,057.55, which the petitioners paid in 1952 to or for the creditors of their wholly-owned corporation. The last issue concerns the proper amount of club dues and expenses which may be deducted by petitioners in each of the four years here involved. Findings of Fact Some of the facts are stipulated and they are found accordingly. Petitioners are husband and wife residing in Tucson, Arizona, and their joint returns for the years involved (including an amended return for 1951) were filed with the then collector of internal revenue at Phoenix, Arizona. Samuel J. Grauman, who will sometimes be referred to as petitioner, is a physician who has been practicing in Tucson for more than twenty-five years. During the year 1950 petitioner subdivided a parcel of realty that he owned in Luther Subdivision in Tucson, Arizona, into some 20 lots. During that year and the year 1951 petitioner sold all of said lots, reporting the gains he realized on such sales as capital gains received in said years. Also in *113 1952, when he received a payment for a lot sold on the installment basis, he reported the gain as capital gain. Respondent determined the gains petitioner realized upon lot sales in 1950, 1951 and 1952 were taxable as ordinary income and petitioner does not contest this determination. Petitioner's real estate business consisted of more than the bare sales of vacant lots. In some instances it consisted of financing the lot purchasers' construction of homes with mortgage security. The buyers of two of the properties were unable to meet their payments and these lots with partially constructed homes were acquired by petitioner through foreclosure proceedings and sold again in 1953, with petitioner realizing total losses on said sales of $4,733.31. In his determination of deficiency for 1953 respondent determined the loss on the above lot sales constituted a capital loss. Sometime prior to the years involved, A. P. Green and his wife operated a pet shop in Tucson under the name of Green's Pet and Garden Shop, Inc. Later the business was incorporated jointly with petitioners and thereafter petitioners bought out the Green's interest in the corporation. By the year 1951 petitioner and his *114 wife owned all of the stock except for one qualifying share, and they operated the business under the name of Paradise Pet and Plant Shop, although the corporation's name remained unchanged. Hereafter the business will sometimes be referred to as the pet shop or the corporation. In 1951 petitioner loaned the corporation $4,328.75 to enable it to pay certain creditors. The loan was evidenced by a promissory note. On or about June 10, 1953, petitioners filed a claim for refund on Treasury Department Form 843 in which they sought a refund of $1,061 for the calendar year 1951 on the ground that the $4,328.75 loaned to Green's Pet and Garden Shop constituted a business bad debt. Respondent has not allowed this claim. In December 1951 the pet shop, while in the process of liquidating, sold all of its assets for $2,593.78. In January of 1952 petitioner turned over $2,057.55 to the attorney handling the liquidation of the corporation to be used for the payment of the corporation's creditors. On his income tax return for 1952 petitioner took a deduction for the above sum as a business bad debt which respondent disallowed. In connection with his practice of medicine, petitioner made some *115 use of his club, the Old Pueblo Club, in downtown Tucson, for the entertainment of patients, business associates, and other doctors. On his income tax returns for the years involved petitioner took deductions for the monthly dues he paid for membership in this club. In the 1950 and 1953 return the deduction was listed "Old Pueblo Club Dues" $166.20 and $195.64, respectively. In the 1951 and 1952 returns the Old Pueblo Club dues were $169.20 and $226.80, respectively, but these amounts were contained in larger totals listed generally on the returns as club "Dues and Subscriptions." Respondent disallowed all of the above Old Pueblo Club dues but allowed petitioner deductions of $100 for each of the years for business entertainment at said club. Opinion Petitioner alleges in his petition that his 1953 sales of lots in Luther Subdivision on which he realized a loss resulted in an ordinary loss and not a capital loss as respondent determined. He points out respondent determined he was in the real estate business in 1950, 1951 and 1952 with respect to the sale of all of his lots, including these two, in Luther Subdivision. He contends the reacquisition and subsequent sale of these two *116 lots was a part of the same real estate business. It is respondent's argument on brief that "petitioner's real estate business terminated with the original sale of the lots in Luther's Subdivision, and that the two clearly isolated sales transactions in 1953 on which the petitioner allegedly suffered losses resulted in capital losses to the petitioner * * *." Respondent's argument goes like this: one of the factors to consider in making a determination of whether a taxpayer is in the real estate business is frequency and continuity of sales (citing ) and merely reselling two lots in one year is insufficient to put petitioner back in the real estate business with respect to such sales. We agree with petitioner. The business enterprise, which respondent found existed in 1950 and 1951 when these lots were originally sold, would extend through the year of resale of the same lots. Petitioner, so respondent holds, was in the real estate business in 1950 and 1951 when selling his lots and financing purchasers' construction thereon, on time payments. Such a business contemplates the possibility of purchasers' defaults in later years and subsequent *117 resales. The factors of frequency and continuity of sales are important when considering whether a taxpayer has entered the real estate business when originally disposing of parcels of realty. Once it has been determined the taxpayer is in the real estate business, the frequency of defaults, foreclosures and resales should not be a factor in determining whether the taxpayer is still in the real estate business. Respondent's argument would lead to a conclusion that the real estate business would continue only if there were many defaults, many foreclosures, and many resales. We hold for petitioner on the issue presented. Petitioner was still in the real estate business in 1953 when the loss sales in question were made. He was entitled to ordinary loss deductions. The next issue is whether petitioner is entitled to a 1951 business bad debt deduction under the provisions of section 23(k)(1) [1] of $4,328.75 by reason of the worthlessness of its loan in that amount to the pet shop. Respondent contends the debt was a nonbusiness bad debt and therefore a capital loss under the provisions of section 23(k)(4). The whole issue here is whether petitioner was, in the year 1951, in the business *118 of loaning money as petitioner contends. He alleges flatly in his petition that he and his wife were in the business of "lending money." Petitioner does not argue that he was in the business of promoting or financing business as was the situation in the cases he cites, such as , and ; but see . Petitioner testified at length in this case but he was not asked a single question about his alleged moneylending business. The only loan he testified he made was the 1951 loan to the pet shop. In his brief petitioner refers us to his income tax returns for 1951 and 1952 reporting the receipt of interest income which indicates receipt of interest income in 1951 from 13 individual mortgagees in the total sum of $4,127.73 and in 1952 from some five individual mortgagees in the total sum of $1,337.36. The returns showing petitioner's reporting of such interest income from certain named persons, standing all alone, with no testimony at all by petitioner as to his alleged money-lending business, is entirely insufficient to show he was engaged in that business *119 at the time of the loan to the pet shop. The indication is that the interest income was from mortgage financing in connection with his real estate business. However, there is no need to speculate for there is just nothing in the record on which to base a conclusion that the loan to the pet shop was a business loan in that it was a part of a money-loaning business petitioner was then engaged in. He makes no other argument in support of his contention that he was entitled to a business bad debt deduction. We hold for respondent on the issue. On his income tax return for 1952 petitioner claimed the sum of $2,057.55 as a business bad debt deduction. The return explains this (and another sum also disallowed but not contested) was advanced to the pet shop in January of 1952 "for the purpose of paying off the creditors of such corporation." Petitioner now argues the deduction should be sustained as a deductible business expense or loss - presumably under the provisions of section 23(a)(1)(A) and section 23(e)(1). The deduction could be sustained as a business expense only if petitioner *120 met his burden of showing it was an "ordinary and necessary" expense. (Section 23(a)(1)(A)). It was incumbent upon petitioner to prove that the circumstances, under which the advancement to satisfy the corporation's creditors was made, show that his professional business would be threatened by the failure to pay his creditors. The payment must have been made to protect petitioner's professional business before it can be said to be the payment of an expense of that business. ; , and cases cited. All that we have here is the testimony of petitioner that it was common knowledge in Tucson that he and his wife owned all of the stock of the corporation. While they did not take any active part in the operation of the business, petitioner's stepson worked there part of the time. Petitioner testified all of his friends "and probably a good many of my patients, as well" knew that he and his wife operated the pet shop. He did not remember who were the pet shop's creditors at the time it was dissolved. He could only say some were Tucson creditors, and he volunteered: "[it] is very likely there were phone *121 bills and light bills and that sort of thing. I can't be sure." Other evidence in the form of a list of creditors as of November 26, 1951, (not very well identified) introduced by petitioner would indicate the pet shop owed around three or four thousand dollars at the time it dissolved and the major portion of this was owed for taxes, to utility companies, and to creditors located outside of Tucson. The record also shows the corporation realized $2,593.78 from a sale of its stock in trade, merchandise inventory and good will, in December of 1951. Evidently the list of creditors grew or the total owed was increased before final settlement in 1952. Respondent's determination is presumptively correct. We cannot say from the facts presented that payment of the pet shop's bills was essential to preserve petitioner's professional business. The pet shop was not a business venture that was started by petitioner. It is not clear to us that petitioner's professional reputation would suffer merely because he bought the stock of a corporation that ultimately failed without being able to pay its debts in full. [2] The circumstances surrounding the payment of the corporation's creditors are totally *122 insufficient to warrant its being considered "ordinary and necessary expenses" within section 23(a)(1)(A). Petitioner is in no better condition with respect to his claim of a deductible loss under section 23(e)(1). The statute grants deduction for certain losses "if incurred in trade or business." Obviously the voluntary payment of a corporation's debts is no part of petitioner's professional business as a practicing physician. . In his petition filed in this case petitioner claims he incurred business expenses in the form of Old Pueblo Club dues in the amounts disallowed by respondent and in addition club expenses for the years 1950, 1951, 1952 and 1953 in the amounts of $229.82, $285.93, $189.16 and $103.35, respectively. He alleges error in respondent failing to allow him deduction of 75 percent of his club dues and expenses. Respondent seemed to recognize petitioner made some business use of his club. He allowed petitioner $100 a year, which seems to us to be a generous estimate from the substantiating testimony *123 offered by petitioner. Petitioner's claim of what appears to be in the neighborhood of $300 a year merely reflects his guess with repect to the business use of his club. Respondent's determinations with respect to the club expenses will be sustained and the increased club expenses claimed in the petition will be denied. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩
2. Petitioners suffered a loss of $11,257.55 on their pet shop stock, which they took as a capital loss in 1952.↩